v. Cityof Wilmington at all. Mr. Battaglia. Thank you, Your Honor. May it please the Court, my name is Victor Battaglia, and I represent the plaintiff, the Walkers, the D. Wayne Walker family in this case. That is, D. Wayne Walker Sr., D. Wayne Walker Jr., and Tatiana Walker. Your Honors, please, this case arose as a result of a raid upon the home of the Walker family in September of 2005, acting under the authority of a search warrant issued by a magistrate judge, 20 heavily armed members of the SWAT team for the City of Wilmington without prior warning or knocking and announcing who they were broke into the home of D. Wayne Walker in the early morning hours. There's a conflict whether it was slightly before 6 a.m. in the morning or slightly after. It is uncontested, it is absolutely uncontested that no conduct of any member of this family or any person they had contact with existed which would justify the intrusion into their home. It is, Your Honor, please, the fact that the Wilmington police confronted the members of the family with automatic weapons which directed laser beams upon members of the family. Mr. Walker was ordered to kneel on the floor. He was handcuffed and an automatic weapon was pointed at his head. Automatic weapons were pointed at Mrs. Walker and D. Wayne Walker Jr. and the family was absolutely terrified. It was 30 minutes of terror that produced a lifetime of horror. The total circumstances demonstrate that the SWAT team violated the Fourth Amendment and that the Wilmington police violated the Fourth Amendment. Most importantly... Mr. Pataglia, do you acknowledge that in the fact of the matter... In the affidavit. In the affidavit. In the affidavit itself. There were false... That's not my question. I ask if whether or not you acknowledge that in the affidavit that was read by the magistrate that issued the search warrant that there existed probable cause for the issuance of that search warrant. I think it's highly questionable for this reason, Your Honor, please. Essentially, the allegations of the search warrant say that a man by the name of Dwayne Walker committed a murder and that he is staying at his mother's house in Newcastle and that there is in Newcastle a family, Dwayne Walker, which Dwayne Walker is a member. Your Honor, please, and I take issue with the question that Your Honor raised because the police had in their lap the official records of the Delaware justice system that identified Dwayne A. Walker, and I'm going to call him DAW because it's easier. They identified him by name, by weight, by age, by height, and by his date of birth. The police knew that they had a problem here, and I'm getting into the second part of my argument, but realizing that problem, they fabricated the allegations. Who fabricated it? The Detective Lawson who signed the affidavit in support of the application. Didn't he testify that that's what he was told by Silver? He testified that, Your Honor, please, and Silver says that he told Lawson what the confidential informant told him. Okay. They withheld the confidential informant until we required that he appear for a deposition. The confidential informant, who was certified by them as proven and past reliable, testified that he never said that. What he said, if Your Honor would like to hear, is that Dwayne Walker was at his sister-in-law's house, and if he was not there, then most probably he might be at his mother's house. Who lived in Newcastle. Who lived in Newcastle. Newcastle. Just moved to Newcastle. That's right. Wasn't it Wilton? I thought they said Wilton. No, sir. Judge, the confidential informant testified that he said Wilton. The detective said in Newcastle. Newcastle. Okay. And what's the difference? Wilton, the section of Newcastle? A subdivision. Sure. Subdivision of Newcastle. Yeah. So it wouldn't be in error if you said that they were, she was in Wilton, that she would also be in Newcastle. I would call it a half-truth in this kind of situation. Okay. You're trying to identify a location and that simply doesn't, that doesn't tell you anything. There may be dozens of Walkers in the city of Newcastle, which is a substantial city. Not one of the biggest cities in Delaware, Your Honor's pleased, but a substantial city. The fact of the matter is, the fact of the matter is that the confidential informant's version has been credited by the judge below, as she had to at this stage, because they were moving for summary judgment. And what the city's excuse at this point is, okay, he didn't say that, but what he did was to paraphrase it. Now, you take what the confidential informant says he said and convert that as Dwayne Walker is hiding in his mother's in Newcastle and getting ready to flee Delaware. The CI never said, CI says he never said any of those things. At this stage of the proceedings, we must accept that as true. It gets clearer as we go through the affidavit. Answer me this question. Aside from this affidavit that you're Correct? Absolutely, Your Honor. They had an arrest warrant, okay? And that helped them catch him. They had an arrest warrant. They did. So they're trying to find DAW. Correct. And they get these different bits and pieces of information. You know, there's a little bit of amnesia out there in the neighborhood, but they get bits and pieces of information. And in their affidavit for the and you argue that that's false. It's clearly inaccurate based on what the CI said, but it's not totally inaccurate, okay? But it's a little bit over the top. Your Honor, it won't find me evil. Let me finish. Franks requires you to reformulate that affidavit. Yes. So if you reformulate that affidavit and say what Silver said, there was a probability that he was at the Okay. And where was the mother? Okay. All they say in paragraph 10 of the affidavit is that the check shows that there's a Dwayne Walker at 118 Dutton Drive. Totally false. Totally false. Yeah, because there's no E in the name. But there's a Dwayne Walker at Dutton Drive, correct? No, sir, that is not correct. There was no Dwayne Walker at that address. There was a Dwayne Walker senior. That's what I said. Remember, they've got the Delgis report that says D.A. Walker. All right. What did they get the search warrant for? For the home of the Walker family. What were they trying to obtain? Evidence of clothing, weapons, that kind of thing. All right. Now, what are they going to find? Evidence of a weapon possessed by Dwayne Walker at the home of this man when there is nobody, that man has never been to Dwayne Walker's home, that nobody in the family has ever had contact with him. So you think one letter in a suffix means the difference in this case? No, sir. I think there are a whole lot of things I can't explain to you. The man's name they were looking for was Dwayne A. Walker, 22 years old. His date of birth, they actually took his date of birth, your honor, please, and falsely inserted it into the allegations in paragraph nine when they talked, a paragraph that talked about the theft of a bicycle of a 15-year-old young Dwayne Walker, Jr. And because they misspelled his name, and they saw an opportunity here, because his name was misspelled Dwayne instead of Dwayne, they claimed that Dwayne Walker was at that address. Now, let me... What they didn't tell the court, if I may, your honor, I'm sorry, but what they didn't tell the court was that the Delgis report for the theft of that bicycle didn't say simply Dwayne Walker. It said Dwayne Walker, no middle name, Jr. Let's suppose they didn't even bother going in to get that search warrant, and they had the information that they had, and they had the arrest warrant that you acknowledge that they had based on sufficient information to arrest DAW. And let's suppose they showed up that morning, it's six o'clock, with that arrest warrant, and they knocked on the door. And behind the door they heard a lot of rustling, and people running, and what have you, and they bursted in. Would that entry have been illegal? I think... Even without a search warrant? I think it would have violated every concept that I have ever believed in the Fourth Amendment. They have to have... The nexus here is probable cause. They cannot make probable cause. You cannot make probable cause of this affidavit. Your Honor, please, this affidavit only has three allegations that say anything in the world about this man's address. None of those allegations is factual. None of them is truthful, and each of them is fabricated, and the worst of all is Paragraph 9, where they took young 15-year-old Dwayne Jr., no middle name, they took his name, and they separated it from the and they inserted... What other purpose could they have had for inserting the date of birth of DAW after this young boy's age? That's a 15-year-old boy, and they were looking for a 22-year-old man. In addition, Your Honor, please, I point out to you that they had actually done a surveillance, and they had seen that there was a 40-year-old man, a 41-year-old woman, a 15-year-old boy, and a 2-year-old female child, and they put DAWs, falsely put his date of birth. So your argument really is they had no information that should have led them there, period? Absolutely correct, Your Honor, please. 100% correct. They had not a bit of honest information. I see my time has expired. I'm happy to try to... And you have time on rebuttal. Let me just make something clear. I'm not sure that you didn't concede something you didn't mean to concede. I thought you were asked whether if what the informant had said had been accurately reported, it would give probable cause to believe that what the guy they were looking for was at this Dutton Road place. Did you mean to say you thought it would? If I had said that, Your Honor, please, I apologize. I did not mean to say that because that standing alone said nothing except there's somebody in Newcastle that you're looking for. Okay, good. I'm glad we got that clarified. Thank you, sir. I appreciate the kindness. Thank you, Your Honor. Mr. Lipkin. Thank you, Your Honor. Let's start off where we just left off. This is a case where, to their credit, the police tried to find some corroborating evidence for what the informant said. In which they didn't find any. If what the informant said had been accurately reported, would there have been probable cause? Do you think the magistrate would have issued a warrant if he knew that all the informant said was, if he wasn't at my sister's house, that's probably the most likely place it would be with his mother? The answer is absolutely, Your Honor. Even though he didn't purport to have any knowledge. He didn't even know where the mother lived. He didn't purport to have seen the suspect or been told anything about the suspect. He was speculating, wasn't he? Well, Your Honor, he said that he told Detective Silvers that the suspect's mother lived in Wilton. To answer your question, Wilton is in Newcastle. He said that he believed the home was, actually I think he said behind Wilton, which is in Newcastle. And then what he said, his exact quote is, the informant stated Walker, this is what the, well the informant's testimony, his supposition. He testified that Walker's mother lives in Wilton, and if he wasn't at his sister-in-law's house, which they had already checked, by the way, that's probably the most likely place he could be found. The first thing Walker would do was run to his mom, which he always done whenever he got in trouble. I think if you substitute that statement for Lawson's statement in his affidavit that the informant stated Walker is currently hiding at his mother's house in Newcastle and is making plans to flee Delaware, even if you found that that statement somehow was so, if you found there was a deliberate lie or reckless disregard and we were forced to substitute that statement with the informant's testimony, you would still have probable cause just based on the informant's testimony. To search, to get a search warrant to search his mother's house. Correct. To get a search warrant to search his mother's house. Okay. And from the- So how do you get from there- Okay. Wait a minute, wait a minute, you mean somebody saying, well, I know him, and yeah, when he gets in trouble, he goes to see his mother. This is past proven. If you were a magistrate and somebody came to you and said, look, he said he always goes to his mother when he gets in trouble, give me a search warrant to go bashing into the mother's house, what would you say to the policeman? You surely wouldn't issue us a search warrant, would you, I hope? Well, I think what you have here is that he said that, you know, he specified he knew the suspect. He knew the suspect's tendencies. He knew that that's the most likely place. Now, I don't think the suspect had to say that with certainty the suspect would- Certainly not. But he said that it would be the most likely place he would go. And from that testimony, the officers did a diligent search. They found a Dwayne Walker spelled exactly like the suspect's name, D-W-A-Y-N-E, not- It doesn't have anything to do, you would agree, with whether he was at the Dutton residence. That, no, that statement does not affect that analysis. The only thing we have here, there's no corroboration of the informant's testimony that I know him and he goes to his mother when he gets in trouble. Correct, Your Honor. I can see that there was nobody that said, I know for a fact he was at this residence. He just said that it was- The affidavit says that, doesn't it? The affidavit- I've been told by a reliable source that he is, what, residing at- Currently hiding. Currently hiding. Can see that the affidavit said that he's currently hiding at his mother's house. Affidavit should have said he's probably hiding at his mother's house. Well, according to what the informant later testified to, assuming that's not what was told to the officer originally, but yes, if we're going to base it on what the informant later testified to, probably should have said was probably there. And I submit that if you change the language, as we're required to do for Franks, if you found that this was a falsehood, which I don't think it is, but I still think it's a reasonable paraphrase, as the district court found. But even if the court did not, if we substituted that language with the language that he used probably there, and then combined, and once you go from that to the diligence report, which found that Dwayne Walker, D-W-A-Y-N-E, albeit no junior, no middle initial there, I think that as a whole would provide probable cause to search. What do you say to your opposing counsel's insinuation that this was intentional? If I understood his argument, he said that the officers intentionally put in the suspect's date of birth, I guess insinuating that they knew it was the wrong house, but they wanted to do a SWAT attack on the wrong house? The only argument that plaintiffs make regarding Detective Lawson's intent, and he says this explicitly on page three of their reply brief, plaintiffs argue, when Lawson found the 2003 diligence report and saw that all involved were African Americans, he decided he would go to any length to obtain a warrant to raid plaintiff's home. This is plaintiff's theory as to Detective Lawson's motivation, that Lawson deliberately falsified the probable cause affidavit solely because of his prejudice toward African Americans. That is explicitly what they said. How do plaintiffs reach this conclusion? Well, according to plaintiffs, Lawson admitted at his deposition that race was the, quote, unquote, deciding factor to enter plaintiff's home. If you look at what Lawson actually said in his deposition, counsel asked, are you saying that when you did the diligence report on Karen Walker, if that had shown up as a Caucasian woman, would anything have been different in this case? Answer, probable. Question, and why would that be? Answer, because that would throw up a flag to me that maybe it's a different Walker from what I was being told. At the risk of stating the obvious, this is only common sense. If the diligence report had indicated that the plaintiffs were white and the officers knew already that the suspect was African American, it would have provided Detective Lawson quite the red flag that he would have had the wrong home. One could only imagine the justifiable outrage that would have occurred had Detective Lawson realized that the plaintiffs were white but decided to enter the home anyway knowing that the suspect was African American. But why wasn't there a red flag regarding the fact that the suspect was 22 and the D. Wayne Walker Jr. was 15? Why didn't that provide a similar red flag? Albeit not as glaringly obvious as the hypothetical you posed, but why wouldn't that provide a red flag? I'm not sure on this record there's evidence that Detective Lawson was aware necessarily of the son's age as far as I read these things. I thought if you looked at the witness statement from the victim report on the bicycle, I thought you could piece together how old D. Wayne Walker Jr. was. If you spent a couple minutes, you could probably deduce that, couldn't you? Couldn't he have done that? He may have been able to do that. What's, I think, important to keep in mind here, there is a suggestion here that we're blaming Detective Lawson for not doing a good job policing. But that's really not the issue, not the question. The question isn't whether he could have done more or whether his investigation was adequate. The issue here is whether Detective Lawson deliberately lied to the magistrate. Or recklessly. If he's reckless, you lose, right? Yes, if he acted in reckless disregard, we would lose on this. Although I submit that with the similarities in the names, when you have the diligence report, these are understandable yet unfortunate errors, but they're understandable in this situation. Should there be a different analysis depending upon the gravity of the offense? And by that, I mean, in this case, it was the gravest offense, right? We have a homicide. First degree murder. Okay. And if you're chasing someone for that kind of grave offense, it stands to reason you're going to have a lot of guys heavily armed, the whole force, right? Absolutely. Now, if this had been a burglary of a corner grocery store, and let's say an unarmed robbery, and you were going to have, instead of the whole SWAT team armed early in the morning, you were going to have three or four officers. Should the affiant police officer be held to a lower standard of care for the unarmed burglary pursuit than this sort of pursuit, where they know if they get the green light from the magistrate, it's going to be pretty intense. Should there be a different standard in the law? Well, I think that there... I think it's not necessarily a different... I wouldn't advocate a different standard with regard to applying to the warrant. I mean, with regard to sending forth the probable cause affidavit, but... I mean, as to what recklessness requires. In other words, should the affiant be required to be more careful when it's a grave situation, and you're going to bring the whole SWAT team onto somebody's house, than the officer who's just going to go with one other officer to inquire about an unarmed robbery? I think that when you're looking at the recklessness analysis, you have to consider the officer as he is sitting in that situation. And when you're dealing with a murder suspect, as opposed to, say, a shoplifter or something else, you have to consider the agency involved in catching somebody that's clearly dangerous, killed someone in cold blood less than 36 hours earlier, and was reportedly making plans to flee Delaware. I think that when you consider the agency and the seriousness of the crime there, I think that does play a role into the analysis of whether the officer acted recklessly. You know, there is certainly more of an urgency, more of a speed, you know, the officer has to act faster to get a murderer off the streets compared to a minor crime, as Your Honor is suggesting. So I think in that sense, it would play a role in a recklessness analysis. Let's take a look. I'm sorry. Go ahead. Let's talk a little bit about the no knock and announce. They go there with a 20-man heavily armed SWAT team and a K-9 unit. And they have no information, no reason to believe that Walker is armed other than possibly he might still 36 hours later have the knife, although we don't know whether he left it. The record doesn't disclose whether the knife was at the scene of the – so, but in any event, there's no reason to believe he has a gun. You got 20 SWAT, heavily armed SWAT people and a K-9 unit. Now, what – how do you answer the thing – the challenge that reasonable Fourth Amendment requires that you knock and announce your presence? What are they concerned about? Well, the knock and announce requirement is obviated when the police officers have a reasonable concern, reasonable belief that they're under the threat of physical violence. And just because the police officers had guns doesn't necessarily mean – and, you know, we didn't necessarily know the suspect did not have a gun. We knew the suspect had a knife or at least did at the time. I think when you're considering the circumstances that this suspect killed someone in broad daylight out on the streets, the officers had a reasonable belief to fear for their safety. And I don't – I think that the use of 20 SWAT team officers here and K-9 units was reasonable under these circumstances. Well, I'm not questioning that. The question is whether when you have all that manpower and dog power surrounding the house, you are justified in knocking in the door and breaking up the furniture in the process of doing it. Well, as the district court found, there's no evidence in the record that the officer had all means of escape covered, that they knew all avenues of escape. It's reasonable to believe that the suspect would know the area better than the officers. There's no record in the evidence that they had everything covered. We might assume it, but there's no record – there's no evidence to that effect. Well, no, you would infer it from the presence of 20 – 20 SWAT team officers and a K-9 unit. You could – couldn't you infer that they might have surrounded the house? Well, I would hope. I would hope too. I would hope, but that being said, I think it's not unreasonable under these circumstances when the officers had word from the confidential informant that they – that the suspect was planning to flee and may flee, that it was the suspect's area. He knew the area well. And again, there's nothing in the record that shows the officers had everything covered or that they knew all avenues of escape that I think under these circumstances the need to knock an ounce was obviated. Mr. Lipkin, the first claim that is made here is that the defendants procured a search warrant by including materially false assertions of admissions in the affidavit. If we find that that is the case and if we find it as modified and with the false statements corrected and the admissions included, that there was no probable cause, where are we in this case? I think the issue is whether or not, because here you did have a magistrate that signed off on the warrant, I think the question for the court is whether you find that Detective Lawson deliberately lied or acted in reckless disregard. Okay. And if we find that he did not deliberately lie or was not reckless in the way he applied for and ended up getting this search warrant, where are we? I believe the district court's opinion must be affirmed. On what basis? If we find there's no probable cause, either modified or as issued. Well, first, I would hope first. I did that and thought the question, I said, where are we? Okay. Because I believe that with the magistrate okaying the warrant in this situation, I think that under Frank's, the question is whether there was falsehoods. I think that's the way to hold the city liable. Did you raise qualified immunity here? Qualified immunity was raised, but interestingly, and I see my time is up. It's okay. Okay. Qualified immunity was raised as was the Monell defense that the Monell defense was raised also. The district court never found, never reached those issues because the court found at the outset that there was no constitutional violations. So she never reached the issues of qualified immunity or Monell. Thank you. Thank you. Your Honor, I'm going to try not to use my whole four minutes, but let me say that I noticed that Mr. Lipkin justified the use of the extraordinary force on the fact that the informant told him that this man was at his mother's house and planning to flee Delaware. The informant, in short words, never said that. That's the state of the record. Well, this is this issue between probably what he would probably do with the informant predicted as opposed to what truly or actually was happening. No, sir. This is the second part of what the informant said. They said the informant said that he was at his mother's house, hiding in his mother's house and planning to flee Delaware. The confidential informant denied ever saying anything, knowing any plans that he had to flee. What the confidential informant said, if Your Honor is pleased, if I knew that he were going to flee, then I think he would probably go to his mother's house to get some money. That's what the confidential informant said. Now, Your Honor, please, an issue came up and Mr. Lipkin took me to task about the race of the mother. The mother issue is a big issue. And let me tell you why. At page 210 of the appendix, the police officer admitted, in fact, that he didn't think that Karen Walker was the mother of DAW. And essentially what he said was, not that I recall, I think we were maybe thinking this may have been a relative, an aunt. Your Honor, this is an abuse  Which officer testified to that? Detective Lawson, the affiant. And the question was raised whether or not they knew that there was a young boy there. There were surveillance a couple of days or a day before. And they noticed the mother, a young boy and a little girl. I'm just not sure I understand your theory of the case. You're saying that they besieged the home of an innocent family intentionally. They knew that this was an innocent family. They saw a young child. You talked about the date of birth. And now you're talking about the surveillance where they see a young child, et cetera. Is your theory of the case that they intentionally assaulted this innocent family? Your Honor, we see it every day at racetracks all over America. Somebody goes to the racetrack with a hunch that big red, the horse is going to win the race and starts compiling facts and figures to support his rationale. That's what they did. He made, he. I don't know if that's a yes or no. I'm sorry. It's yes. They intentionally besieged an innocent family with 20 armed men. And within minutes of doing so, the lead investigator said, oh my, I'm very sorry. Here's my card. Call me and we'll pay for all the damage. Because he had a hunch. He had a hunch. And he was it. Well, was it a hunch that was a good faith mistake? Or was it an was it an intentional besieging of an innocent family? It was a hunch that had no foundation. In fact, our testimony, Your Honor, please. It was a hunch. It was nothing more than a wild hunch. Was it reckless or deliberate? The misstatements were deliberate. I think it was reckless. The hunch was reckless. But I think the misstatements were deliberate in order to fortify the hunch. Your Honors, please. I'm grateful for your attention. And this man, Your Honor, please, has been disturbed by the city of Wilmington. He's been disturbed by the police. I don't want to end up being disturbed by me. But I so I thank you for your kind consideration. Well, thank you. Thank counsel for your arguments and your briefing on the matter. And we'll take it under advisement.